[899 NYS2d 177]

In the Matter of JAMES RICHES et al., Appellants, v NEW YORK CITY COUNCIL et al., Respondents.

First Department, April 15, 2010

## APPEARANCES OF COUNSEL

*Norman Siegel*, New York City, *McLaughlin & Stern, LLP*, New York City (*Steven J. Hyman* of counsel), and *Philip Van Buren*, New York City, for appellants.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Elizabeth I. Freedman, Leonard Koerner, Spencer Fisher* and *Stephen Kitzinger* of counsel), for respondents.

## OPINION OF THE COURT

FREEDMAN, J.

We affirm the motion court's dismissal of this matter (2008 NY Slip Op 32030[U]) as a proper exercise of discretion.

Eight citizens bring this proceeding, pursuant to section 1109 of the New York City Charter, requesting that Supreme Court conduct a summary judicial inquiry concerning the City Council's practice of allocating funds to nonexistent entities during its initial budgeting process. Section 1109 provides that upon application, a Supreme Court justice may conduct an inquiry for the purpose of alerting the public to a "violation or neglect of duty" by government officials. The circumstances giving rise to this application arose when local newspapers, including the New York Post, the New York Times, and the Daily News, published the findings of an investigation conducted by the New York City Department of Investigation concerning allocation of funds by the City Council to fictitious organizations or entities, which respondents call "holding codes," for the purpose of making supplemental allocations to existing organizations.

The motion court made findings that the City Council's practice of holding funds in reserve for community programs had been in existence since 1988. During this time funds al-

located to these reserve accounts were disbursed during the fiscal year through contracts with city agencies. Starting in 2001 and continuing through 2007, a total of $17.4 million had been budgeted that way, but instead of being put into reserve or holding accounts, the funds were allocated to "holding codes" or fictitious organizations. City Council Speaker Christine Quinn announced that she had ordered this practice stopped in the spring of 2007, but when she discovered that it continued in the fall of 2007 in spite of her directive, she alerted investigators from the United States Attorney's Office and the New York City Department of Investigation. On April 15, 2008, a federal grand jury sitting in the Southern District of New York, after looking into the practice, returned an indictment against two staff members of a New York City Council member for conspiracy to commit mail fraud and conspiracy to commit money laundering in connection with an alleged scheme to embezzle money from a real organization, the Donna Reid Memorial Education Fund, to which the City Council had appropriated funds.

Petitioners contend that the practice of allocations to nonexistent organizations, which has now been publicly disclosed and discontinued, constituted a violation or neglect of duty in relation to the property, government or affairs of the City of New York because it violated New York City Charter § 100 (c) which requires that the budget be itemized for each program, person or institution and be so described in the preliminary and final budget. According to petitioners, this practice also violated the City Council's duty as trustee of the property, funds and effects of the City as set forth in New York City Charter § 1110 and allowed the Speaker to broker agreements for future allocations.

Petitioners seek to examine Mayors Giuliani and Bloomberg, Speakers Vallone, Miller and Quinn, former City Council finance director Michael Koegh, deputy finance director Staci Emanuel, current Council Speaker chief of staff Charles Meara, special counsel to the Speaker Wayne Kwadler and Comptrollers William Thompson and Allan Hevesi to inquire of them concerning their knowledge of and acquiescence in the practice of allocating City Council funds to "fictitious" organizations for the purpose of making later allocations to needy organizations.

Section 1109 of the City Charter, under which petitioners make this request, states as follows:

"A summary inquiry into any alleged violation or

neglect of duty in relation to the property, government or affairs of the city *may be* conducted under an order to be made by any justice of the supreme court in the first, second or eleventh judicial district on application of the mayor, the comptroller, the public advocate, any five council members, the commissioner of investigation or any five citizens who are taxpayers, supported by affidavit to the effect that one or more officers, employees or other persons therein have knowledge or information concerning such alleged violation or neglect of duty. Such inquiry shall be conducted before and shall be controlled by the the justice making the order or any other justice of the supreme court in the same district. Such justice *may* require any officer or employee or any other person to attend and be examined in relation to the subject of the inquiry. Any answers given by a witness in such inquiry shall not be used against such witness in, any criminal proceeding, except that for all false answers on material points such witness shall be subject to prosecution for perjury. The examination shall be reduced to writing and shall be filed in the office of the clerk of such county within the first, second or eleventh judicial district as the justice may direct, and shall be a public record" (emphasis added).

The dissent would find, for the first time since the passage of the predecessor to section 1109 of the New York City Charter in 1873 (Laws of 1873, chapter 335, § 109, later section 1534 of the Greater New York Charter and section 889 of the New York City Charter), that a Supreme Court justice's denial of that application was an abuse of discretion.

Respondents City Council and Speaker Quinn moved to dismiss the proceeding on the grounds that the purpose of the Charter provision was to expose municipal corruption or closely related matters and that the dispute here is primarily political. They also contend that the underlying facts, namely the allocation of funds to fictitious organizations, are undisputed and have received extensive publicity. Respondents further contend that appropriate organs of government are addressing the matter, that the total amount involved for all of the seven years involved (2002-2008) amounted to just $17.4 million, and that the City Charter provision asking a judge to conduct such an inquiry is unconstitutional. Respondents aver that a summary inquiry would likely frustrate ongoing criminal investigations.

City respondents contend that this Charter provision, originally enacted in 1873 as a special remedy in the reform charter and incorporated as section 1534 into the Greater New York Charter, was designed to root out corruption after the Boss Tweed era and specified various acts including wrongful diversion or misapplication of funds, or betrayals of trust, as potential subjects of inquiry. The provision was restated in 1936 (NY City Charter § 889, subsequently renumbered as section 1109 of the current City Charter) in a more general statement, namely, "alleged violation or neglect of duty."

The City maintains that the original purpose and scope of the provision remains the same as it was before the language change. The purpose stated in the 1917 case of *Matter of Mitchel v Cropsey* (177 App Div 663, 670 [1917]) was to expose corruption and wrongful diversion of funds, and not to investigate the propriety of legislative issues. City respondents insist that petitioners have not alleged that funds were actually misapplied, but merely that the budgeting process frustrated certain provisions of the City Charter. They contend that section 1109 was intended to be a vehicle for exposing more venal acts.

While petitioners contend that the 1936 language change stating "any alleged violation or neglect of duty" expanded the scope of inquiry beyond simply exposing corruption, they also argue that the current claims involving "misappropriation of funds" constitute corruption because it gave the Speaker the ability to control council member votes by granting or withholding funds to members' districts. Whether the post-1936 language expanded the scope of the provision, as petitioners claim, or is merely a reiteration of the original purpose, as the City and motion court argue, is not pertinent here because our decision does not turn on an analysis of the change.

City respondents also contend that the provision is flawed in that it assigns an unorthodox and unconstitutional role to Supreme Court justices by imposing a "public trust" upon justices in violation of NY Constitution, article VI, § 20 (b) (1), which provides that a justice of the Supreme Court may not hold any other public office, with certain inapplicable exceptions. Section 1109 asks justices, based on simple affidavits, to engage in a nonjusticiable procedure to create a public record without reaching any findings. The City claims that the justice then becomes an investigator or commissioner and is thrust into a political role or a role that belongs to another branch of government. Respondents invoke *Matter of Richardson* (247 NY

401 [1928]), wherein the Court of Appeals found that a statute allowing the Governor to use a Supreme Court justice as a "standing commissioner" to investigate charges against public officials was unconstitutional because it imposed another "public trust" (*id.* at 419).

While several courts have addressed the issue of section 1109's constitutionality, and no court has found it to be unconstitutional,* that too is not the basis for our determination here.

The parties agree that, before the current matter, 12 applications were made pursuant to section 1109 or its predecessors. It appears that the inquiry only went forward in one case, *Matter of Leich* (31 Misc 671 [Sup Ct, Kings County 1900]). With the exception of *Leich* and *Matter of Green v Giuliani* (187 Misc 2d 138 [2000]), in the other reported cases, either the nisi prius court or the appellate court found that proper exercise of discretion mandated dismissal of the application. For example, in *Matter of Greenfield v Quill* (189 Misc 91 [1946]), the court declined to conduct an inquiry concerning whether the respondent could at the same time receive a salary as a council member and receive a salary and expenses as an officer of the Transport Workers Union, since the court had no power to oust a council

---

* In *Matter of Mitchel v Cropsey* (177 App Div 663 [1917], *supra*), and most recently in *Matter of Green v Giuliani* (187 Misc 2d 138 [2000]), courts have upheld the constitutionality of the Charter provision. In *Mitchel,* the Second Department found that section 1534 was generally constitutional even though it conferred nonjudicial functions upon Supreme Court justices, but it also found that it could not be used to infringe upon legislative functions or for citizens to investigate the propriety or wisdom of legislative questions. That case attempted to challenge the wisdom of a contract that the Board of Estimate and Apportionment entered into on behalf of the City of New York with the New York Central Railroad Company that would alienate lands belonging to the City.

In *Green,* the trial court granted an application by the Public Advocate pursuant to section 1109 for an inquiry concerning the source of information that the Mayor disclosed in public statements about an individual shot by a police officer. The petitioner claimed that the Mayor had obtained the information concerning the victim from court records that had been sealed and should not have been made available. The court found that the question of how the information had been obtained had not been answered and, relying on *Mitchel* and *Matter of Davies* (168 NY 89 [1901]), upheld the constitutionality of the provision as applied to matters involving a judicial purpose (187 Misc 2d at 142-143). The court proceeded to describe other judicial functions that were not of a determinative nature, such as presiding over a grand jury investigation. That decision was not appealed and the issue that was the subject matter of the inquiry was resolved without the inquiry going forward. Similarly in *Matter of Leich* (31 Misc 671 [1900]), a trial court upheld the constitutionality of section 1534, finding that the immunity conferred was adequate, and ordered public officials to testify.

member and the fact of the two salaries was known. In *Matter of Larkin v Booth* (33 AD2d 542 [1969]), this Court specifically questioned whether the denial of an ex parte application made under section 1109 was even appealable, but went on to determine that since there was no factual dispute concerning the making of a contract between the New York City Commission on Human Rights and the Metropolitan Life Insurance Company as landlord, the court did not abuse its discretion in denying the application (*see also Matter of Larkin*, 58 Misc 2d 206 [1968] [holding that whether to grant order for a summary inquiry is purely within the discretion of the court]; *Matter of City of New York [Seligman]*, 179 Misc 505, 511 [1942] [holding that a summary inquiry was a "matter of sound judicial discretion"]). The court in *Seligman* was asked to inquire into the private use by city officials and public employees of property owned by the City of New York, but found that such inquiry was unnecessary because two extensive investigations had been undertaken, one by the New York City Commissioner of Investigation and one by a Bronx County grand jury.

It is clear that the Charter provision's use of the word *"may"* when it states that a "summary inquiry . . . may be conducted . . . by any justice of the supreme court" gives the Supreme Court justice discretion to determine when such an inquiry is called for or appropriate. Implicit in the use of *"may"* is that the court has such discretion. As noted above, in *Matter of Larkin v Booth* (33 AD2d 542 [1969], *supra*), this Court questioned whether denial of an application made pursuant to section 1109 is even appealable. Where, as here, a Supreme Court justice declines to conduct such an inquiry and articulates reasons for refusing to do so, the decision should not be reviewed except in a case where there is a clear abuse of discretion.

The Supreme Court Justice here furnished several legitimate reasons for denying the application. First, the practice of reserving funds in the name of nonexistent organizations had been acknowledged and had received extensive publicity. Second, as did the court in *Seligman* (179 Misc at 510-511), the court found that the ongoing investigation of the practice by two governmental agencies was sufficient to safeguard the public interest. The court also found that the practice of reserving funds was not the type of transgression that the Charter provision was designed to address (*see Mitchel*, 177 App Div at 670).

Because the Southern District investigation was ongoing, the United States Attorney had sought to intervene here to seek a

90-day stay of any inquiry until its work was done. Respondents did not oppose a stay, but since it was exercising its discretion to deny the inquiry, the motion court found it unnecessary to decide that issue.

The dissent, while acknowledging that there were other ongoing investigations, opines that those investigations have not answered all of the questions that petitioners wanted to pose to the various witnesses. The dissent also avers that the other investigations do not guarantee the type of exposure that this inquiry would feature. The allegedly unanswered questions include which individuals knew about the practice, when the information became available, and whose influence determined where the $17 million over the seven-year period actually went. Petitioners also want a sworn statement that the practice has ceased. However, it is not clear what purpose would be served at this time in requiring sworn testimony from a host of past city officials about prior allocations of a small percentage of funds to legitimate community organizations. Such an inquiry would only be a source of unnecessary publicity and likely involve undue interference with the City Council's prerogative of maintaining responsibility for its own budget.

For the foregoing reasons, we affirm on the basis that the Supreme Court exercised its discretion appropriately in denying the application for a summary inquiry.

Accordingly, the order and judgment (one paper), of the Supreme Court, New York County (Joan B. Lobis, J.), entered July 24, 2008, dismissing this proceeding for a summary judicial inquiry pursuant to New York City Charter § 1109, should be affirmed, without costs.

CATTERSON, J. (dissenting). Because I believe that the majority has chosen to ignore allegations of misfeasance involving the allocation of more than $17,000,000 in municipal funds to a "slush fund," as well as more than a century of law, I respectfully dissent. New York City Charter § 1109 provides for a summary judicial inquiry at the behest of citizen taxpayers of the City of New York. It is unique in its scope and exists solely to shine the light of public scrutiny on the actions of public officials. For the reasons that follow, I find that it is abundantly clear that section 1109 is not limited to allegations of official

corruption, and the tide of current events requires just such an inquiry.[1]

The petitioners—eight citizen-taxpayers from all five boroughs of New York City—brought the instant proceeding, seeking a summary inquiry into respondent New York City Council's practice of making appropriations to fictitious organizations from 2001 through 2007. Approximately $17.4 million was so appropriated.

Relying on newspaper articles, the petitioners alleged:

> "Upon information and belief, the funds appropriated to fictitious entities were later used at the Council Speaker's discretion to reward groups that were loyal to her, to reward politically important allies and cooperative council members, and to fund favored council members' favored projects. . .

> "Upon information and belief, the grant or withholding of appropriations to grantees of an individual council member's choosing . . . are used as a means of controlling how individual council members vote . . .

> "Upon information and belief, at least one of the groups ultimately funded through the Practice used funds for political purposes. . . Upon information and belief, the Donna Reid Education Fund allegedly used $21,000 in City Council funds for political fliers and a hall used for events for a political club . . . The Donna Reid fund received approximately $14,000 from the City Council accounts of the fictitious New York Foundation for Community Development and American Association of Concerned Veterans."

The petition alleged the following violations:

> "The New York City Council, from 2001 through 2007, violated New York City Charter § 100 (c) . . . Under Charter § 100 (c) the budget must be itemized for each program, purpose, activity or institution . . . Itemization to a non-existent grantee is

1. As recently as February 9, 2010, the United States Attorney for the Southern District of New York obtained an indictment against a City Council member on charges stemming from the investigation into the allocation of the funds at issue here, which the media popularly characterize as a "slush" fund.

not an itemization to any particular program, purpose, activity or institution.

"[By engaging in the practice,] the New York City Council violated the intent and frustrated the statutory scheme of City Charter § 100-105 and § 225-§ 258 to create a unified, accountable annual budgeting process . . .

"The New York City Council violated its duty as a trustee of the property, funds and effects of [the] city under New York City Charter § 1110 . . . Making appropriations to non-existent entities . . . constitutes a waste of public funds in so far as the additional appropriations require taxation in excess of the actual foreseen and declared cost of the services and . . . items to be obtained."

The petition suggested specific questions that should be asked in the inquiry, and that a summary inquiry was not duplicative or superfluous:

"Petitioners are aware that the matter has been referred to the United States Attorney for the Southern District and the New York City Department of Investigation. Such referrals, however, do not ensure that the full facts . . . will come to public light. Facts discovered in the office of the United States Attorney are not made public when there is no criminal indictment or more broadly than the facts necessary for such indictment. Similarly, findings of the New York City Department of Investigation[ ] that do not result in Formal Disciplinary Proceedings are not reported to the public. In the event of Informal Proceedings, the record or result of the DOI's investigation is expunged."

The respondents (the New York City Council and Christine Quinn) moved to dismiss the petition pursuant to CPLR 3211. Additionally, the United States Attorney moved to intervene and, "if the . . . petition . . . is . . . not dismissed before testimony is taken, staying for an initial period of 90 days any testimony that would confer any form of immunity on any witness." The petitioners did not oppose the motion to intervene.

The motion court denied the petition and dismissed the proceeding, finding that "a summary inquiry is not warranted under the nature of the allegations in the petition." (2008 NY

Slip Op 32030[U], *6.) The court stated, "The matter at issue has already received substantial publicity and press coverage. The practice has allegedly stopped and investigations by governmental agencies are underway . . . The primary purpose of the summary inquiry [i.e., to expose corruption] . . . is not met here." (*Id.* at *8.) I believe that this was error on several levels.

As a threshold issue, I agree with the petitioners' contention that New York City Charter § 1109 is not limited to inquiries into allegations of official corruption. Seemingly the majority does not dispute that by its plain terms, section 1109 simply is not so limited; it applies to "any alleged violation or neglect of duty in relation to the property, government or affairs of the city." Most recently, it has been used to challenge the disclosure of information from a sealed juvenile criminal record. (*Matter of Green v Giuliani*, 187 Misc 2d 138 [Sup Ct, NY County 2000].)

The motion court improperly limited the scope of section 1109. In support of that view, the court relied on *Matter of Mitchel v Cropsey* (177 App Div 663 [1917]),[2] wherein the Second Department noted that the predecessor of section 1109, then Greater New York Charter § 1534, was enacted in 1873, at a time of "corruption of city officials and the looting of the city treasury by the so-called Tweed ring." (*Id.* at 670.) In *Mitchel*, the Court held that pursuant to its very terms, section 1534 "was intended to expose the acts of corruption and raids on the city treasury, then believed to be prevalent." (*Id.*)

*Mitchel* does not support the respondents' position or the motion court's analysis for two reasons. First, contrary to the respondents' view, the *Mitchel* Court did not dismiss the petition on the ground that it did not involve allegations of corruption. Rather, the petition in *Mitchel* alleged that the New York City Board of Estimate and Apportionment was *about* to enter into a contract with a railroad company. (*Id.* at 670.) The Second Department held that "there can be no diversion of funds, no violation of statute nor delinquency until the board has acted." (*Id.* at 671.) The Court pointed out that "[t]he proposed contract may never be carried out." (*Id.*) Furthermore,

"[i]t would be intolerable if, in respect to every

---

2. Mitchel was argued for the City of New York by Charles Evans Hughes (an alumnus of what is now Colgate University) following his tenure as an Associate Justice of the United States Supreme Court and his failed presidential bid against Woodrow Wilson in 1916. Of course, 13 years later he became Chief Justice of the Court.

pending proposition before the board of estimate and apportionment, from building a subway or bridge to acquiring land for a schoolhouse, all the heads of departments of the city could be haled into court and cross-examined by disaffected taxpayers, or even by some other hostile official, with no result except publicity." (*Id.* at 672.)

Thus, the sole ground for dismissal was that any petition for inquiry was entirely premature when no official action had actually taken place.

Second, the statute at the time of *Mitchel* was worded differently than it is today; then section 1534 provided that ·

"[the] examination shall be confined to any inquiry into any alleged *wrongful diversion or misapplication of any moneys or fund*, or any violation of the provisions of law, or any want of mechanical qualifications or any neglect of duty of inspectors, or any delinquency charged in the affidavit touching the office or the discharge or neglect of duty." (*Id.* at 666 [emphasis added]; *see also Green,* 187 Misc 2d at 149-150.)

The respondents claim that "[i]n reviewing the scope of Charter § 1109, it is appropriate to construe it 'as the courts would have construed it if it had come in question soon after its passage.' *People v Broadway Railroad Company,* 126 NY 29, 37, 26 N.E. 961, 963 (1891); McKinney's Statutes § 93." When viewed in the historical context, it would be folly to construe section 1109 in the same fashion as its 1873 predecessor when the provision has been amended substantively since 1873. (*See e.g. Matter of Raritan Dev. Corp. v Silva,* 91 NY2d 98, 103 [1997] [amendment is meant to effect some change in existing law]; McKinney's Cons Laws of NY, Book 1, Statutes § 93.) Indeed, *People v Broadway R.R. Co. of Brooklyn* (126 NY 29 [1891]), quoted by the respondents, did not involve a subsequent amendment to a statute.

The respondents' reference to McKinney's Consolidated Laws of NY, Book 1, Statutes § 93 is also inapposite to their argument; that section says, "Generally, a statute speaks, not from the time when it was enacted, or when the courts are called on to interpret it, but as of the time it took effect." First, "[i]t is a fundamental tenet of statutory construction that every word in a statute is to be given effect. (McKinney's Cons Laws of NY, Book 1, Statutes § 231.) Limiting the summary inquiry provi-

sion to allegations of financial corruption would . . . do violence to that basic principle of statutory construction." (*Green*, 187 Misc 2d at 150.)

Second, even were we to construe section 1109 in the same fashion as its nineteenth century analog, the respondents' interpretation is nonetheless wrong. If the Legislature's sole purpose had been to expose acts of corruption or misapplication of funds, the predecessor to section 1109 would not have specifically included within its scope inquiries not involving corruption: namely, "want of mechanical qualification for any inspectorship of public work." (*Green*, 187 Misc 2d at 149.)

It is true that, even after section 1109 was amended to delete any reference to wrongful diversion of money, a court stated:

> "the sole legislative purpose in the enactment of section 1109 was to bring acts of corruption to the public's attention by an investigation that thereafter 'shall be a public record' (see Matter of Greenfield v. Quill, 189 Misc. 91; Matter of City of New York [Seligman], 179 Misc. 505; and Application of Rolnick, et al., 69 N. Y. S. 2d 13)." (*In re Moskowitz [Lindsay]*, NYLJ, July 7, 1970, at 10, col 6 [Sup Ct, NY County 1970].)

It is clear that to the extent *Moskowitz* could be read to support the respondents' position, it was wrongly decided and should not be followed. None of the cases cited by *Moskowitz* stand for the proposition that section 1109 or its predecessors were limited to allegations of corruption. *Greenfield* found there was no need for a summary inquiry because there was "no material issue as to the facts." (189 Misc at 96.) *Seligman* denied an application for a summary inquiry because the issue had already been thoroughly covered by: the Commissioner of Investigation (who submitted reports with 1,518 pages of testimony); a grand jury (which heard 85 witnesses and received 203 exhibits); and the President of the Civil Service Commission (whose investigation involved 648 pages of testimony). (179 Misc at 506-508, 510). *Rolnick* denied the application because there was nothing in the predecessor to section 1109 which allowed the court "to oust a public officer or to declare his office vacant." (69 NYS2d at 13.)

The respondents contend that New York City Charter § 1109 is analogous to General Municipal Law § 51. However, the respondents do not cite any case under section 1109 or its pred-

ecessors that looked to General Municipal Law § 51. Even were we to apply a General Municipal Law § 51 analysis, it would not bar the instant petition. The petitioners do not seek injunctive relief, nor have they alleged waste. Furthermore, on a CPLR 3211 motion to dismiss, where all inferences are drawn in favor of the nonmovant, one can certainly infer that the practice which the petitioners seek to expose to the light of public inquiry is capable of mischief to the public fisc, a fact that the majority chooses to ignore.

The respondents claim that if section 1109 is not limited to allegations of corruption, municipal government could be paralyzed "on nothing more than a whim." This is simply and conclusively refuted by the historical record of such proceedings. Indeed, in the 137 years since 1873, there have been only 13 reported requests for a summary judicial inquiry,[3] most of which have been denied. As the first case interpreting section 1109's predecessor stated, "If it be said that [the statute] enables the citizen to be meddlesome, the answer is that purity and integrity in government can be obtained and preserved only by the wholesome vigilance and meddlesomeness of the citizen." (*Leich*, 31 Misc at 672.) The history of such proceedings demonstrates that while the inquiries may be "meddlesome," they are nonetheless rare.

Even if I assumed that allegations of corruption were necessary, the petition contains such allegations. For example, the petition points out that some of the money allocated to fictitious

---

**3.** In chronological order, they are *Matter of Leich* (31 Misc 671 [Sup Ct, Kings County 1900] [declaring predecessor of section 1109 constitutional and ordering testimony to be taken]); *Mitchel, Seligman, Rolnick,* and *Greenfield* (all discussed above); *Lium v Board of Election, City of N.Y.* (93 NYS2d 860 [Sup Ct, NY County 1949] [holding that predecessor of section 1109 did not allow court to enjoin defendant from including a certain individual on the ballot]); *Matter of City of New York* (NYLJ, Feb. 5, 1964, at 14, col 1 [Sup Ct, NY County 1964] [eyesore not enough to warrant summary inquiry]); *Matter of Larkin* (58 Misc 2d 206 [Sup Ct, NY County 1968] [no need for summary inquiry because there was no dispute as to material facts]); *In re Anderson* (NYLJ, Oct. 28, 1969, at 2, col 1 [Sup Ct, NY County 1969] [denying application for summary inquiry where respondents did not have unconditional duty to make repairs]); *Moskowitz* did not empower court to investigate implementation of local law re narcotics; *Jones v Beame* (86 Misc 2d 832 [Sup Ct, NY County 1976], *revd* 56 AD2d 778 [1st Dept 1977] [about standing to sue in general, not specifically related to section 1109], *affd* 45 NY2d 402 [1978]); *Matter of Goldstein (Dryfoos)* (NYLJ, Jan. 13, 1983, at 11, col 5 [Sup Ct, NY County 1983] [summary inquiry denied where some of allegations were not related to respondent's acts as a city councilman, and the papers filed with the court constituted an adequate record as to remaining allegations]); and *Green* (187 Misc 2d 138 [2000] [granting application for summary inquiry]).

organizations was subsequently disbursed to the Donna Reid Memorial Education Fund. In turn, the Donna Reid fund used some of that money "for political fliers and a hall used for events for a political club that . . . was controlled by" the councilman who directed money toward the Donna Reid fund in the first place.

The respondents, relying on NY Constitution, article VI, § 20 (b) (1), contend that section 1109 is unconstitutional on its face because it violates the prohibition against a justice holding any other public office or trust. They also contend that section 1109 is unconstitutional as applied because it (a) violates the principle of separation of powers and (b) calls on the court to engage in fact-finding in a nonjusticiable controversy. We categorically reject these contentions.

"[E]nactments of the Legislature . . . are presumed to be constitutional; those who challenge statutes bear a heavy burden of proving unconstitutionality beyond a reasonable doubt." (*City of New York v State of New York*, 76 NY2d 479, 485 [1990].)

The argument that section 1109 or its predecessor confers nonjudicial functions on justices of the Supreme Court or violates the separation of powers has previously been rejected. The Court's reasoning in *Mitchel* is particularly instructive:

> "A purely legislative or executive function cannot be cast on the courts, for that would violate the provisions of the Constitution vesting the legislative power in the Senate and Assembly and the executive power in the Governor. But this line of demarcation has never been so artificially drawn as to prevent assignment to justices of this court of duties which relate to their general powers, or which call for the exercise of judgment or of that peculiar knowledge and skill which are the result of judicial experience. Many duties of this character are exercised by justices of the Supreme Court and judges of the County Court, instances of which are acknowledgments of deeds, adoption of children, appointment of commissioners of condemnation, approval of certificates of incorporation, guardianship of children and of the insane. A justice who acts under section 1534 of the charter is called upon to exercise functions much more nearly approaching the judicial. He must determine whether the affida-

vit makes out a case under the statute; he must decide upon the relevancy of the evidence to the charges contained in the affidavit, and finally, in aid of the examination, he may punish for contempt—a power essentially judicial.

"Although this proceeding itself cannot be called a judicial one, yet judicial methods are used, and judicial powers incidentally invoked; and, bearing in mind the duty of the courts to sustain acts of the Legislature, if by any reasonable interpretation that can be done, I am led to the conclusion that the act casting on the justices of this court the power to order such examination does not violate either the letter or the spirit of the Constitution." (177 App Div at 668-669; *see Leich,* 31 Misc at 672-673.)

Section 1109 poses no different constitutional question than its predecessor, and the *Mitchel* Court's reasoning guides our conclusion here.[4]

Contrary to the respondents' argument, *Jones v Beame* (45 NY2d 402 [1978]) does not hold that section 1109 violates separation of powers. In *Jones,* section 1109 was the last of 11 causes of action. (*See* 86 Misc 2d at 834.) Other causes of action sought, among other things, judgments "declaring that conditions in the city zoos constitute cruelty to animals" and "waste of municipal assets," "an injunction restraining sale of animals from the city zoos, the closing of those zoos, and the compulsory transfer of all animals to the Bronx Zoo." (*Id.*) Under those circumstances, the Court of Appeals understandably stated that "the plaintiffs would embroil the courts in the administration of programs the primary responsibility for which lies in the executive branch of government." (45 NY2d at 406.) Further, the Court noted that the case involved "allocation of resources and priorities inappropriate for resolution in the judicial arena." (45 NY2d at 407 [internal quotation marks and citation omitted].) By contrast, in the instant case, the petitioners request only a

---

**4.** I recognize that *Matter of Richardson* (247 NY 401 [1928]) postdates *Mitchel* and *Leich.* However, *Richardson* is inapposite. It involved a different statute (Public Officers Law § 34), pursuant to which the Governor directed a justice of the Supreme Court to conduct an investigation. (247 NY at 405, 408-409; *see Green,* 187 Misc 2d at 145 ["In contrast to the statute challenged in *Richardson,* under the summary inquiry provision, the Justice of the Supreme Court is not made the delegate of the Governor, or of any other executive official. Nor does section 1109 make her a prosecutor, with an investigatory staff of her own"]; *see also Seligman,* 179 Misc at 511.)

summary inquiry; such an inquiry would neither embroil the courts in administration nor involve allocation of resources.

Notably, section 1109 does not "call[ ] on the court to engage in fact-finding." The statute merely requires "[t]he examination [of witnesses to] be reduced to writing and . . . filed in the office of the clerk."

The respondents' argument that this matter involves a nonjusticiable political question has previously been rejected. (*See Green*, 187 Misc 2d at 148 ["(t)hat a case may have political overtones, involve public policy, or implicate some seemingly internal affairs of the executive or legislative branches does not . . . render the matter nonjusticiable" (internal quotation marks and citations omitted)].) The court presiding over a summary inquiry does not decide a political question; as previously noted, it does not reach a conclusion.

The respondents' argument that section 1109 calls for an advisory opinion has also previously been rejected. (*See id.* [since section 1109 does not provide for "a decision or opinion by the court," it "does not call for an advisory opinion"].)

The only real point of departure with my colleagues in the majority is their inexplicable view that it is "not clear what purpose would be served at this time in requiring sworn testimony from a host of past city officials about prior allocations of a small percentage of funds to legitimate community organizations." I categorically reject the notion that $17 million is a small amount of funds not worthy of notice. Furthermore, the allegations of the petition serve to question not only the appropriation, but also the very existence of the groups who were the alleged recipients.

Finally, the majority concludes its refusal to allow the Charter-based inquiry on the astonishing statement that "[s]uch an inquiry would only be a source of unnecessary publicity and likely involve undue interference with the City Council's prerogative of maintaining responsibility for its own budget." The majority clearly has chosen to disregard the admonition of United States Supreme Court Justice Brandeis that "[s]unlight is said to be the best of disinfectants." (Louis D. Brandeis, Other People's Money and How The Bankers Use It, at 92 [Fredericks A. Stokes Co. 1914].) In my view, the record of disbursements at issue firmly demonstrates that publicity attendant to the Council's actions is far from the majority's characterization as "unnecessary." Furthermore, the City Charter provides for exactly the type of "influence" over the Council's actions that the majority is seeking to actively prevent.

SWEENY, J.P., and BUCKLEY, J., concur with FREEDMAN, J.; CATTERSON and ACOSTA, JJ., dissent in a separate opinion by CATTERSON, J.

Order and judgment (one paper), Supreme Court, New York County, entered July 24, 2008, affirmed, without costs.