OPINION OF THE COURT
Louise Gruner Gans, J.
This is a petition by Mark Green, Public Advocate of the City of New York, pursuant to section 1109 of the New York City Charter, for a summary judicial inquiry into the actions taken and public statements made by New York City’s Mayor, Rudolph Giuliani, concerning Patrick Dorismond’s juvenile and criminal record, after the unarmed Dorismond was shot by a New York City police officer on March 16, 2000.
For a period of several days after Dorismond’s death, Mayor Giuliani made repeated statements to the press, disclosing details of Dorismond’s alleged criminal record, both as a juvenile and as an adult. According to the petition, the statements were widely publicized. It is undisputed that at least some of the information made public by the Mayor relates to records which had been sealed pursuant to the Criminal Procedure Law and/or the Family Court Act. There is no indication that *140 any court order was obtained by the Mayor to unseal Mr. Dorismond’s records before their content was publicized.
The Public Advocate alleges that the public disclosure of Mr. Dorismond’s juvenile and criminal record was unauthorized, and that other cases involving such disclosure by the Mayor have come to his attention. On that basis, the Public Advocate seeks an inquiry into how the Mayor obtained the information which he made public, whether the information was from sealed records, and whether its release was made without regard to the statutory protection of such records from disclosure under New York State law, in particular, sections 166 and 375.1 of the Family Court Act and CPL 160.55.
Section 1109 of the New York City Charter, pursuant to which the Public Advocate seeks a summary inquiry, provides as follows:
“A summary inquiry into any alleged violation or neglect of duty in relation to the property, government or affairs of the city may be conducted under an order to be made by any justice of the supreme court in the first, second or eleventh judicial district on application of the mayor, the comptroller, the public advocate, any five council members, the commissioner of investigation or any five citizens who are taxpayers, supported by affidavit to the effect that one or more officers, employees or other persons therein named have knowledge or information concerning such alleged violation or neglect of duty. Such inquiry shall be conducted before and shall be controlled by the justice making the order or any other justice of the supreme court in the same district. Such justice may require any officer or employee or any other person to attend and be examined in relation to the subject of the inquiry. Any answers given by a witness in such inquiry shall not be used against such witness in any criminal proceeding, except that for all false answers on material points such witness shall be subject to prosecution for perjury. The examination shall be reduced to writing and shall be filed in the office of the clerk of such county within the first, second or eleventh judicial district as the justice may direct, and shall be a public record.”
The Mayor has not submitted an affidavit responding to the allegations of the petition. Appearing by Corporation Counsel, the Mayor contends that the sealing requirements under the *141 Family Court Act and the Criminal Procedure Law do not apply to deceased persons,[1] and seeks dismissal of the Public Advocate’s application, arguing that: (1) section 1109 is unconstitutional on its face and as applied; (2) the dispute is beyond the scope of the inquiry permitted by section 1109 because it does not concern municipal corruption or closely related matters; (3) the inquiry is unauthorized because the underlying facts are undisputed and have been publicly addressed; and (4) the dispute is primarily political and/or legal debate and additional factual inquiry would be a waste of judicial and public resources.
Facial Constitutionality of Section 1109
In considering the Mayor’s arguments, the court is guided by “the familiar proposition that enactments of the Legislature, a co-equal branch of government, are presumed to be constitutional; those who challenge statutes bear a heavy burden of proving unconstitutionality beyond a reasonable doubt (see, e.g., Elmwood-Utica Houses v Buffalo Sewer Auth., 65 NY2d 489, 495).” (City of New York v State of New York, 76 NY2d 479, 485 [1990].)
The Mayor contends that section 1109 improperly assigns a role to a Justice of the Supreme Court which constitutes a “public trust” in violation of article VI, § 20 of the New York State Constitution. Section 20 (b) (1) prohibits Justices of the Supreme Court from “holding] any other public office or trust except an office in relation to the administration of the courts, member of a constitutional convention or member of the armed forces of the United States or of the state of New York.” (NY Const, art VI, § 20 [b] [1].)
The provision for a summary inquiry was first enacted by the State Legislature in 1873, and with slight variations has been included in every New York City Charter since that time.[2] Its constitutionality was upheld in Matter of Mitchel v Cropsey *142 (177 App Div 663 [2d Dept 1917]), when a summary inquiry was sought pursuant to the then section 1534 of the Greater New York Charter into changes proposed to be made in the franchises granted by the City of New York to the New York Central Railroad. Mitchel, then Mayor of the City of New York, opposed the inquiry, alleging that section 1534 was unconstitutional because it conferred “non-judicial functions upon justices of the Supreme Court.” (177 App Div, at 665.) The Appellate Division rejected his argument, finding that while the summary inquiry does not involve a judicial proceeding in the sense that it results in a judicial determination, it does nevertheless involve duties which may appropriately be delegated to judicial officers, and requires the Supreme Court to exercise judicial functions, such as determining whether a claim has been stated under the statute, conducting a hearing, ruling on the admissibility of evidence, and exercising contempt powers.
For its ruling, the Appellate Division in Mitchel (supra) relied on Matter of Davies (168 NY 89 [1901]), which raised virtually identical issues. In Davies, the Court of Appeals upheld the constitutionality of chapter 690 of the Laws of 1899, which authorized the Attorney General of the State of New York, prior to initiating an action alleging unlawful monopolies or restraints of trade, to obtain an order from a Justice of the Supreme Court directing persons mentioned in the application to appear before the Justice to provide testimony and produce documents, which would then be filed in the office of the County Clerk. {Id., at 97.) In Davies, as in Mitchel, the statute was challenged as unconstitutional on the ground that it delegated nonjudicial duties to Justices of the Supreme Court.
In upholding chapter 690, the Davies Court concluded that the duties imposed by that statute were of a judicial character, and therefore did not violate a constitutional prohibition on Judges exercising nonjudicial functions:
“Thus the justice is called upon to exercise the judicial function of deciding whether the application conforms to the statute * * * the same as is required of him when an application is made for an order of arrest, a warrant of attachment or any other provisional remedy. His duty is not merely clerical but requires the exercise of judgment.” (Davies, supra, at 103.)
*143 The analyses in both Mitchel (177 App Div, at 666-667, supra) and Davies (168 NY, at 104, supra) noted that in order to qualify as such, judicial functions had to be judicial in form as well as purpose, but held that a judicial purpose did not necessarily require a judicial determination. Both Courts concluded that, even without a judicial determination, the presentation of testimony before a Justice of the Supreme Court in anticipation of future litigation was not violative of the constitutional prohibition against the exercise of nonjudicial functions, because it could be termed incidental to a potential judicial proceeding and was sufficiently related to a cognizable judicial purpose.
Both the Davies and the Mitchel Courts recognized that “th[e] line of demarcation” (Mitchel, supra, at 669) between legislative and administrative functions on the one hand and judicial functions on the other hand cannot be precisely drawn. (Davies, supra, at 102.) Both Courts pointed out that many traditionally recognized judicial functions, such as the approval of certificates of incorporation, the acknowledgment of conveyances, the solemnization of marriages, the appointment of commissioners of jurors, and the investigation of the financial affairs of villages, are close to but fall within that line of demarcation. (Davies, supra, at 103-106; Mitchel, supra, at 669.)
Grand Jury proceedings pursuant to CPL 190.85 provide another illustration of traditionally recognized legal proceedings in which the judicial function is outside the conventional mold. Similar in many respects to the summary inquiry authorized by section 1109, CPL 190.85 authorizes a Grand Jury, after investigation initiated pursuant to CPL 190.55, to issue a report concerning not only criminal but also noncriminal “misconduct, non-feasance or neglect in public office by a public servant.” (CPL 190.85 [1] [a], [b].) CPL 190.85 (1) (c) authorizes the issuance of a Grand Jury report “[proposing recommendations for legislative, executive or administrative action in the public interest based upon stated findings.” A Grand Jury may be empaneled to conduct an investigation into aspects of government operations and issue a report as to its findings. (See, e.g. Matter of Report of Aug. Sept., 1983 Grand Jury III, 103 AD2d 176 [2d Dept 1984].) Essentially, in such Grand Jury proceedings a Supreme Court Justice (along with the prosecuting attorney) is limited to the role of a ‘legal advisor” (CPL 190.25 [6]), who does not preside over the proceedings, but rules on questions of law arising during the conduct of the *144 investigation. The Justice reviews the resulting report to ensure that the report is based on the credible admissible evidence presented to the Grand Jury, and that it provides statutory procedural protections to identified or identifiable persons. Code of Criminal Procedure § 253-a, from which CPL 190.85 is derived, has been upheld as a constitutional legislative enactment. (Matter of Second Report of Nov., 1968 Grand Jury, 26 NY2d 200 [1970].)[3]
The Public Advocate is an independently elected official with capacity to sue. (Matter of Green v Safir, 174 Misc 2d 400, 406, affd 255 AD2d 107 [1st Dept 1998], lv denied 93 NY2d 882 [1999].) He is intended to be “a ‘watchdog’ over City government and a counterweight to the powers of the Mayor.” (Supra, 174 Mise 2d, at 403.) The authority of the Public Advocate to petition for a summary inquiry pursuant to section 1109 exists in tandem with his mandate under New York City Charter § 24 (í), (g) and (h) to investigate and report on complaints of mismanagement or misfeasance by City agencies.
The function and purpose of a Justice of the Supreme Court in presiding over a summary inquiry resulting in a report by the Public Advocate is a judicial function comparable to that of a Justice presiding over a Grand Jury investigation and report pursuant to CPL 190.85. Moreover, since the inquiry sought in this case focuses on the failure to protect information in sealed court records, it serves a purpose significantly related to the administration of justice in the City’s Family and Criminal Courts.
Accordingly, whether the Public Advocate’s ultimate objective in seeking a summary inquiry is, as Corporation Counsel presumes, “to pursue a lawsuit against the City” (respondent’s mem of law, at 14), or to use the inquiry as a basis for the issuance of a report (NY City Charter § 24), the function and purpose of a Justice of the Supreme Court in presiding over such an inquiry at the instance of the Public Advocate is cognizably judicial.
The Mayor cites Matter of Richardson (247 NY 401 [1928]), in which the Court of Appeals held that section 34 of the Public Officers Law, permitting the Governor to direct a Justice of the Supreme Court to take evidence in a proceeding for re *145 moval of a public officer and to report on the evidence to the Governor, constituted an improper “public trust.” The Court concluded that, under the Public Officers Law, the designated Justice was improperly made “the delegate of the Governor in aid of an executive act, the removal of a public officer” (id., at 410), who was “to obey” “[a]s often as the Governor commands” (id., at 419), was made a prosecutor, and had his own counsel and assistant counsel, experts and detectives (id., at 411).
However, this case is distinguishable from Richardson (supra). In contrast to the statute challenged in Richardson, under the summary inquiry provision, the Justice of the Supreme Court is not made the delegate of the Governor, or of any other executive official. Nor does section 1109 make her a prosecutor, with an investigatory staff of her own.
None of the cases concerning New York City Charter § 1109 or its predecessor statutes have treated the court’s role as prosecutorial. (See Matter of Larkin, 58 Misc 2d 206 [Sup Ct, NY County 1968], affd 33 AD2d 542 [1st Dept 1969]; Matter of Mitchel v Cropsey, 177 App Div 663 [2d Dept 1917], supra; Greenfield v Quill, 189 Misc 91 [Sup Ct, Kings County 1946]; Application of Rolnick, 69 NYS2d 13 [Sup Ct, Kings County 1946]; Matter of City of New York [Seligman], 179 Misc 505 [Sup Ct, Bronx County 1942]; Matter of Leich, 31 Misc 671 [Sup Ct, Kings County 1900].) This court interprets the language of section 1109, “[S]uch an inquiry * * * shall be controlled by the justice,” as representing no more than a shorthand reference to the court’s inherent power to control the proceedings before her. (Gabrelian v Gabrelian, 108 AD2d 445 [2d Dept], appeal dismissed 66 NY2d 741 [1985]; Wehringer v Brannigan, 232 AD2d 206 [1st Dept 1996], appeal dismissed 89 NY2d 980 [1997].)
As the statute and cases cited show, the court’s role in the summary inquiry is to preside over a proceeding adversary in form, taking testimony at the instance of both parties, and ruling as to relevancy and reliability under customary rules of evidence.
I conclude that the duties of the Justice under the summary inquiry provision are more akin to those upheld by the Court of Appeals in Davies (supra), and by the Appellate Division in Mitchel (supra), and more consistent with the variety of traditionally permissible judicial roles than those which were struck down in Richardson (supra), and that respondent has not met his burden of showing that section 1109 creates a constitutionally impermissible “public trust.”
*146 Constitutionality of Section 1109 as Applied
The Mayor further contends that, if a summary inquiry were granted, section 1109 would be unconstitutional as applied because it would violate the principle of separation of powers. He argues that the summary inquiry sought by the Public Advocate is just the sort of interference with the details of municipal administration rejected by the Court of Appeals in Jones v Beame (45 NY2d 402 [1978]), and proscribed by the political question doctrine. The court disagrees.
In Jones (supra), the cause of action for a summary inquiry into the conditions of the City zoos was part of a larger complaint for declaratory and injunctive relief brought by private persons and organizations concerned with the generally inadequate treatment of animals in municipal zoos as a result of New York City’s then fiscal crisis. The Court dismissed the complaint, stating that plaintiffs, no matter how sincerely motivated, could neither utilize the courts to intervene in the fiscal choices made by the City, nor assume the management or operation of administrative agencies.
The appellate decisions in Jones (supra) provide little guidance for addressing the questions presented here. While the trial court in Jones sustained as viable the cause of action for a summary inquiry pursuant to New York City Charter § 1109 (86 Misc 2d 832, 842-843), the claim was never separately addressed by the Appellate Division, First Department (56 AD2d 778 [1977]), or even mentioned by the Court of Appeals (45 NY2d 402 [1978], supra). The thrust of both appellate decisions, under the doctrines of standing or justiciability, was that the “judicial process is not designed to or intended to assume the management and operation of the executive enterprise.” (Jones v Beame, 45 NY2d, at 408.) Even if that holding were treated as limiting the scope of section 1109 in some circumstances, it has no application here, where the summary inquiry is sought with respect to allegations of specific misconduct in relation to specific statutory provisions. (See Jones v Beame, 56 AD2d, at 779.)
Matter of New York State Inspection, Sec. & Law Enforcement Empls. v Cuomo (64 NY2d 233 [1984]), also relied on by the Mayor, is equally inapposite. No claim pursuant to section 1109 of the New York City Charter was involved in that case. There, employees of a correctional facility sought to enjoin its scheduled closing as a violation of their statutory right to a safe workplace under the Labor Law. The Court of Appeals dismissed their complaint, holding that the statutory claims *147 were asserted prematurely, and that while the right to a safe workplace was enforceable under the Labor Law, it did not extend to the kind of claim asserted by the employees. According to the Court of Appeals, the policy decision of whether to close a correctional facility was a political question left to the Department of Correctional Services as part of the executive branch of government, and was thus nonjusticiable.
Here, in contrast to Jones and Law Enforcement Empls. (supra), the Public Advocate is not seeking to order fiscal priorities, or to obtain general oversight of an executive or administrative agency. A decision by the Mayor to release of protected information is not a matter of policy uninhibited by statutory mandate. On the contrary, access to sealed records is carefully regulated by statute. (Family Ct Act §§ 166, 375.1; CPL 160.50, 160.55, 720.35.) Rather, the Public Advocate seeks to discover answers to the following questions:
“What were the specific sources of Mr. Giuliani’s statements about Mr. Dorismond’s prior encounters with the criminal justice system?
“What specific records were examined?
“For each disclosure, was the information obtained from records of the New York City Family Court, the New York Criminal Court, the New York City Police Department, the New York City Probation Department and/or files of the State Division of Criminal Justice Services (DCJS)?
“If so, had these records been sealed by court order or by operation of statute, or both?
“Did the records reviewed by the Mayor or others contain codes or other designations indicating that they were subject to seal?
“How did Mr. Giuliani obtain this information? Was he assisted in that endeavor by other City or State officials and/or employees, and if so, who were they and how did they obtain the records cited?
“Did Mr. Giuliani personally review the files or did he rely on others?
“Did the Mayor’s public statements misrepresent Mr. Dorismond’s history?
“Was the Mayor’s disclosure of information from sealed records a violation of court orders and/or statutes?
“Did the confidentiality of the records terminate *148 once Mr. Dorismond was deceased?
“If the Mayor was not entitled to release or disclose sealed records, has the Mayor violated or neglected his duties in relation to the property, government or affairs of the City by releasing information from sealed records in the custody of the City of New York and thereby contravening State law and his oath of office?”[4] (Affidavit of petitioner Mark Green, dated Mar. 27, 2000, 24.)
These questions do not constitute a free-wheeling general investigation into the Mayor’s conduct of his duties or the operations of City agencies, and do not seek to interfere with municipal policy or budget-making functions. Instead, they are focused on the facts underlying the Public Advocate’s allegations that in publicizing Mr. Dorismond’s criminal and juvenile record, the Mayor disregarded the specific provisions and requirements of the Criminal Procedure Law and the Family Court Act governing access to and dissemination of the content of such records. That “a case may have political overtones, involve public policy, or implicate some seemingly internal affairs of the executive or legislative branches does not * * * render the matter nonjusticiable” (Gruen v County of Suffolk, 187 AD2d 560, 562 [2d Dept 1992], quoting Matter of Boung Jae Jang v Brown, 161 AD2d 49, 55, quoting People v Ohrenstein, 153 AD2d 342, 411). Nor does it implicate the “political question” doctrine. (Id.)
Neither does the Public Advocate impermissibly seek an advisory opinion from this court, as the Mayor also contends. Although the Public Advocate seeks information relating to specific questions, he does not specifically request, nor does section 1109 provide for, a decision or opinion by the court. It provides for a written record which is filed with the County Clerk. Thus the summary inquiry does not call for an advisory opinion.
Nor can section 1109 be held invalid because it does not satisfy the criteria for a case and controversy set forth in article III of the United States Constitution. Under article III, a petitioner or plaintiff “ ‘must allege personal injury fairly traceable to the defendant’s allegedly unlawful conduct and likely to be redressed by the requested relief.’ ” (Raines v Byrd, 521 US 811, 818 [1997].) That standing requirement in Federal court, *149 which is “grounded in the Federal constitutional requirement of a case or controversy * * * [is] a requirement that has no analogue in the State Constitution.” (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772 [1991].) The terms of New York City Charter § 1109, a legislative enactment which has the force of State law (Matter of Mitchell v Borakove, 225 AD2d 435, 438-440 [1st Dept, Tom, J., concurring], appeal dismissed 88 NY2d 919 [1996]), expressly conferred standing on the Public Advocate to petition for a summary inquiry. Respondent has not demonstrated that its enactment was inconsistent with the New York State Constitution. I find that within its limited framework, section 1109 is not unconstitutional as applied, on any of the grounds asserted by the Mayor.
Applicability of Section 1109 to Alleged Violations of the Family Court Act and the Criminal Procedure Law
Next, the Mayor contends that section 1109 was intended to be limited to acts of corruption and misapplication of City funds, and that therefore the inquiry sought by the Public Advocate is beyond the scope of section 1109. The Mayor states that, “[i]n reviewing the scope of Section 1109, it is appropriate to construe it ‘as the courts would have construed it if it had come in question soon after its passage.’ ” (Respondent’s mem of law, at 16.) The principle of statutory construction quoted by the Mayor relates to the question of whether a statute speaks “from the time when it was actually enacted * * * when the courts are called upon to interpret it, [or] the time it took effect.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 93.) This principle has little or no bearing on the question before this court of construing a law which was enacted more than 100 years ago, and the relevant portion of which was later changed by a subsequent Legislature.
Section 1109, as originally enacted in the New York City Charter of 1873, authorized a specified list of officials to seek a summary inquiry into
“any alleged wrongful diversion or misapplication of any moneys or fund, or any violation of the provisions of law, or any want of mechanical qualification for any inspectorship of public work, or any neglect of duty in acting as such inspector, or any delinquency charged in said affidavit touching the office or the discharge or neglect of duty, of which it is alleged in the application for said order that such alderman, head of department, or other aforementioned officer or persons, had knowledge or infor *150 mation.” (NY City Charter former § 109, L 1873, ch 335.)
In 1936, that provision was broadened to include the president of the City Council among the persons who could request an inquiry. In addition, the scope of inquiry was made more general, stating that inquiry could be sought regarding “any alleged violation or neglect of duty in relation to the property, government or affairs of the city.” (NY City Charter former § 889, authorized by L 1936, ch 483.) More recently, in 1993, the Public Advocate replaced the president of the City Council as one of the persons who could request a summary inquiry. (NY City Charter § 1109.)
Although inquiries into financial corruption may have been a primary reason for enacting the summary inquiry provision (see, Matter of Mitchel v Cropsey, 177 App Div 663 [2d Dept 1917], supra), the language of the current section 1109 could hardly be broader. It applies to all forms of official misconduct and easily encompasses the unauthorized release of the contents of sealed court records.
It is a fundamental tenet of statutory construction that every word in a statute is to be given effect. (McKinney’s Cons Laws of NY, Book 1, Statutes § 231.) Limiting the summary inquiry provision to allegations of financial corruption would, of course, do violence to that basic principle of statutory construction. In light of the 1936 amendment to section 1109, this court need not determine whether the original summary inquiry provision was intended to be limited to financial misdeeds, as the Mayor contends. Section 1109, as it now stands, is not so limited, and the inquiry sought by the Public Advocate is within the permissible scope of inquiry authorized by the New York City Charter.
The various sealing requirements which are the focus of the Public Advocate’s petition are an extremely important part of our juvenile and criminal justice systems. Family Court Act §§ 166 and 375.1 and CPL 160.50, 160.55 and 720.35 are the core provisions of an elaborate statutory scheme. They are designed to insure that the person charged but not convicted of a crime (or in the case of a juvenile, not convicted of a designated felony) is protected from the stigma that accompanies a criminal prosecution. Our courts have repeatedly noted that even an unsuccessful criminal prosecution can adversely affect both a person’s reputation and his employment prospects. (See, Matter of Harper v Angiolillo, 89 NY2d 761 [1997].) To protect against these adverse consequences, the Legislature has established broad sealing requirements. (Id.) *151 Because of the important remedial purposes of the sealing statutes, they include strict safeguards, though in appropriate cases the court may unseal records if they pertain to the business of the court and unsealing is essential to the proper administration of justice. (See, Matter of Hynes v Karassik, 47 NY2d 659, rearg denied 48 NY2d 656 [1979].)
Regardless of whether the confidentiality of these records continues after the death of their subject, the unsealing of the records is not self-executing. The ability and willingness of the Mayor, in concert with executive agencies serving under his aegis, to bypass the sealing safeguards, in the Dorismond case, as well as in other cases cited by the Public Advocate, to ignore the procedures for judicial unsealing, and disseminate information contained in sealed records at will, presents a question as to the functioning of municipal government of sufficient importance to warrant a summary inquiry.
Subject Matter of the Hearing
Finally, the Mayor contends that the Public Advocate’s application should be denied because there are no questions of fact in dispute here, and therefore the application is not the proper subject matter for a section 1109 inquiry. According to the Mayor, because testimony has been provided at a legislative hearing by the Police Commissioner and the Corporation Counsel on the matter, this court should dismiss the application in the exercise of sound judicial discretion.
Although there do not appear to be questions of fact regarding whether information concerning Mr. Dorismond, which was contained in sealed Family Court and/or Criminal Court records, was made public by the Mayor, that is not the end of the matter. The Public Advocate seeks an inquiry concerning how that information was kept by the relevant agencies and how it was obtained by the Mayor. In unsworn testimony before the Joint Public Hearing of the New York State Assembly Standing Committees on Codes, Judiciary, and Children and Families, Police Commissioner Safir stated that he was given a memo from his staff containing the information, which he then orally conveyed to the Mayor. However, neither Commissioner Safir nor Mr. Hess gave complete testimony concerning how the various files are maintained, who actually obtained the information which was in the staff memo given to Commissioner Safir, or from which specific files the information came. No answer was provided to the question whether information sealed by court order is nevertheless not expunged from probation or police records, for example. In short, most of the ques *152 tions raised by the Public Advocate remain unanswered. Therefore, I conclude that a summary inquiry would not be an inappropriate waste of public resources, as the Mayor contends.
The inquiry may not, however, be utilized to merely question the Mayor about what he has already conceded: that he in fact made public information which was contained in sealed records. Nor will this inquiry, as presented, result in a determination by the court of legal issues raised by the release of the information for that would be beyond the scope of the New York City Charter authorization.
Accordingly, it is hereby ordered that petitioner’s application is granted; and it is further ordered that respondent’s challenge to the application is denied; and it is further ordered that within 21 days of service of a copy of this order with notice of entry petitioner shall serve on counsel for the Mayor and submit to the court a list of witnesses whom he seeks to examine; within 15 days thereafter the Mayor may serve and submit objections to the proposed witnesses, if any, and identify witnesses he proposes to present.

. No legal authority has been cited in support of this argument. Although there has not been a direct legal pronouncement, available legal authority suggests that sealing requirements and concomitant requirements of a court order for unsealing continue to apply after the death of the subject. (See, e.g. Holmes v DeVincenzo, 163 AD2d 594 [2d Dept 1990]; Gray v State of New York, 130 Misc 2d 65 [Fam Ct, Monroe County 1985]; Matter of County of Nassau v Heine, 80 AD2d 640 [2d Dept], Iv denied 53 NY2d 607 [1981]; People v Seeley, 179 Misc 2d 42, 53 [Sup Ct, Kings County 1998]; Matter of Gannett Suburban Newspapers v Clerk of County Ct. of County of Putnam, 230 AD2d 741 [2d Dept 1996].)

. The provision was first enacted as section 109 by chapter 335 of the Laws of 1873; was renumbered as section 1534 in the Greater New York *142 Charter of 1897; revised and renumbered in the 1936 Charter as section 889; and renumbered in 1961 as the section 1109 now in effect.

. Various procedural protections have been built into the Grand Jury process for the benefit of affected individuals. For example, the court may order that the Grand Jury report be sealed. (CPL 190.85 [3], [4], [5].) However, the Mayor’s challenge to section 1109 is not based on the absence of procedural protections for him.

. As to the last four questions which call for legal conclusions, the court assumes that the inquiry will only produce evidence as to the answers.