Matter of Carr v De Blasio (2021 NY Slip Op 04412)





Matter of Carr v De Blasio


2021 NY Slip Op 04412


Decided on July 15, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: July 15, 2021
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick
Cynthia S. Kern Anil C. Singh Peter H. Moulton


Index No. 101332/19 Appeal No. 14059-14059A Case No. 2021-00016, 2021-00476 

[*1]In the Matter of Gwen Carr et al., Petitioners-Respondents,
v
Bill De Blasio etc., et al., Respondents-Appellants.



Respondents appeal from an order of the Supreme Court, New York County (Joan A. Madden, J.), entered September 24, 2020, which denied respondents' motion to dismiss the petition brought pursuant to New York City Charter § 1109, and granted the petition to the extent of ordering a summary inquiry into (1) alleged violations and neglect of duty in connection with the stop and arrest of Eric Garner in the fatal incident on July 17, 2014, and the force used by police officers other than Officer Daniel Pantaleo; (2) the filing of official documents concerning Garner's arrest; (3) the leaking of Garner's alleged arrest history and medical conditions in the autopsy report; and (4) the alleged lack of medical care provided to Garner by police officers. Respondents also appeal from an order, same court and Justice, entered on or about December 23, 2020, which granted petitioners' motion for an order directing the parties to move forward with judicial inquiry proceedings during the pendency of respondents' appeal from the September 24, 2020 order.




James E. Johnson, Corporation Counsel, New York (Richard P. Dearing, Claude S. Platton and Elina Druker of counsel), for appellants.
New York Law School Racial Justice Project, New York (Alvin Bragg and Rachel Welt of counsel), and Law Offices of Gideon Oliver, New York (Gideon Orion Oliver of counsel), for respondents.



Singh, J. 


This appeal from the grant of a petition for summary inquiry pursuant to New York City Charter § 1109 has its genesis in the fatal arrest of Eric Garner and the subsequent investigations and actions that this tragedy prompted. We find that this is the rare case in which allegations of significant violations of duty, coupled with a serious lack of substantial investigation and public explanation, warrant a summary inquiry to bring transparency to a matter of profound public importance: the death of an unarmed civilian during the course of an arrest. Accordingly, we unanimously affirm the order granting the petition.
The Arrest and Death of Eric Garner [FN1]
In March 2014, New York City Police Department (NYPD) Lt. Christopher Bannon was tasked with investigating the sale of untaxed cigarettes near Tompkinsville Park, in Staten Island. Between March 28, 2014 and July 16, 2014, the police made multiple arrests for the sale of untaxed cigarettes in that area, including, allegedly, two arrests of Eric Garner.
On July 17, 2014, Bannon was driving near Tompkinsville Park when he saw about 10 people "huddled" together. Bannon believed that the people were engaged in the illegal sale of untaxed cigarettes although he did not see any cigarettes being sold. Bannon directed that Officer Justin D'Amico, the Quality of Life Coordinator, be dispatched to the area, accompanied by another officer, to determine whether untaxed cigarettes were being sold.
D'Amico responded, accompanied by Officer Daniel Pantaleo. Both conducted surveillance from an unmarked car, approximately 200-300 feet from 202 Bay [*2]Street, where they observed two men, one of whom was Garner, talking near a beauty supply shop. While D'Amico observed a sale, Pantaleo did not. The officers then drove around the block, parked, and approached Garner. As they did, D'Amico observed a second sale, and, again, Pantaleo did not.[FN2] D'Amico told Garner that he was being arrested for selling untaxed cigarettes. Garner denied selling cigarettes and told D'Amico that he had been breaking up a fight. Two witnesses later gave testimony corroborating Garner's statement.
Nonetheless, D'Amico attempted to persuade Garner to comply with the arrest. Garner, who had been arrested in the past by both D'Amico and Pantaleo, believed that he was being harassed and refused to be handcuffed. At this point, a struggle ensued between the officers and Garner. Two other NYPD officers, Craig Furlani and Mark Ramos, approached. Pantaleo put his arm around Garner's neck and applied a chokehold. Pantaleo and D'Amico then took Garner down to the ground. Pantaleo applied the chokehold for a number of seconds. By the time Garner was on the ground, two more officers, Sgt. Kizzy Adonis and Officer William Meems, had arrived on the scene.
Videos taken by witnesses showed that after releasing the chokehold, Pantaleo repeatedly pushed Garner's head onto the sidewalk, while the other officers were piled on top of Garner, almost completely covering his entire body. Videos also showed and Pantaleo testified that he heard Garner "wheezing" and stating at least 11 times, "I can't breathe," as he lay on the sidewalk. Garner was a large man, and the officers joined three handcuffs together to handcuff him.
Garner's words became more labored. He then fell silent. The officers rolled Garner, now unresponsive, onto his side. Meems observed that his breathing was shallow but confirmed that he had a pulse and called for someone to notify Emergency Medical Services (EMS). Nonetheless, the officers apparently believed that Garner might have been "playing possum," or feigning unconsciousness to avoid arrest, and declined to administer any medical care.
Sgt. Dhanan Saminath arrived on the scene and made a second call to EMS. At Saminath's direction, D'Amico searched Garner's body, finding four sealed packs of cigarettes and one open pack with 15 cigarettes, for a total of 95 cigarettes. The packs bore Virginia, not New York, tax stamps.
An ambulance arrived about five minutes after Garner had been taken to the ground. The Emergency Medical Technicians (EMTs) and paramedics were employees of Richmond University Medical Center (RUMC) and responded to the 911 call via a standing agreement with the New York City Fire Department (FDNY). Several officers assisted in moving Garner into the ambulance. The ambulance drove for about five minutes, then pulled over and waited for a paramedic to arrive. The paramedic used a defibrillator and only then began CPR.
Garner was taken to the emergency room, with CPR continuing, and was intubated. He [*3]died at the hospital.
Meanwhile, Saminath returned to the precinct from the hospital. He texted Bannon to inform him that Garner had "resisted" and "might be DOA." Bannon asked if it was "for the smokes." Saminath answered, "Yea[h]," adding that Pantaleo "grabbed him [and] they both fell down." Bannon replied, "Not a big deal, we were effecting a lawful arrest."
When D'Amico returned to the precinct, he processed arrest papers and drew up charges, filling in "no" for "force used." Under "top charge," D'Amico wrote violation of Tax Law § 1814(a), a class E felony that requires an attempt to evade the tax on 10,000 or more cigarettes, an amount more than 100 times greater than the 95 cigarettes found on Garner's person.
On July 18, 2014, Dr. Floriana Persechino of the New York City Office of the Chief Medical Examiner performed an autopsy. Dr. Persechino ruled Garner's death a homicide, finding the cause of death to be "compression of [the] neck, chokehold, chest compression, [and] prone positioning during physical restraint by police." Dr. Persechino explained that "the chokehold, the chest compression, [and] the prone positioning [ ] set into motion a lethal . . . [cascade] of events, where [underlying] natural diseases now are contributing to the death." Dr. Persechino concluded that the chokehold was "a significant initial factor in the cascade," in that it "compressed" Garner's "airway making it difficult for him to breathe," thereby "triggering the asthma attack" that ultimately contributed to Garner's death.
That same day, NYPD's Internal Affairs Bureau (IAB) commenced an investigation into Garner's death. IAB conducted Patrol Guide Procedure No. 206-13 hearings with respect to 21 police officers. Of these, 5 officers were subjects of the investigation, and 11 others were at the scene that day. The IAB investigation concluded that Pantaleo had used a chokehold maneuver, which is banned by Patrol Guide Procedure No. 203-11 "Use of Force," and recommended that disciplinary charges be served on him.
The Richmond County District Attorney's Office also investigated the incident. On December 3, 2014, a Staten Island grand jury voted not to indict Pantaleo.
Beginning in 2014, the US Department of Justice (DOJ) conducted a civil rights investigation into the incident. Although the NYPD and City officials had repeatedly stated that they could not pursue charges or take further action against the officers due to a pending DOJ investigation, in response to a FOIL request, DOJ stated in July 2018 that they had no objection to disciplinary proceedings moving forward. On July 16, 2019, DOJ announced that it would not bring charges against Pantaleo.
In October 2014, Garner's mother, petitioner Gwen Carr, filed a notice of claim with the New York City Comptroller stating her intent to sue the City and NYPD for $75 million, plus attorneys' fees, alleging negligence, recklessness, and carelessness by police officers during Garner's arrest and death. In [*4]July 2015, the Comptroller's office announced that, following review of the case, it had settled all claims for $5.9 million. At this point, the officers, including Pantaleo, had yet to be formally disciplined.
The Civilian Complaint Review Board (CCRB) also investigated the conduct of the officers at the scene. In September 2017, CCRB found that Pantaleo had used a prohibited chokehold and restricted Garner's breathing. CCRB recommended NYPD charges and an administrative trial. In July 2018, after multiple delays, the NYPD finally served Pantaleo with charges based on the CCRB report; trial was to commence the following year. During the nearly five years between Garner's death and the trial, Pantaleo continued to be employed by the NYPD as an officer, receiving full pay and benefits, but was assigned to desk duty.
The departmental trial of Pantaleo was held in May and June of 2019. Fifteen witnesses testified, including eyewitnesses, medical experts, and experts in police practices. Pantaleo, represented by counsel, declined to testify. The trial evidence included cell phone video footage, the NYPD Patrol Guide and training materials, and Garner's autopsy report. In a 45-page report and recommendation summarizing the evidence, the administrative law judge found, by a preponderance of the evidence, that Pantaleo was guilty of third-degree assault and recommended his termination. In August 2019, the NYPD Commissioner adopted the report and recommendation and dismissed Pantaleo from the NYPD.
Pantaleo brought a CPLR article 78 proceeding to annul the determination and direct his reinstatement. By order entered March 25, 2021, this Court unanimously confirmed his dismissal, finding that "[s]ubstantial evidence supports [the] conclusion that [Pantaleo] recklessly caused injury to Eric Garner by maintaining a prohibited chokehold for 9 to 10 seconds after exigent circumstances were no longer present, thereby disregarding the risk of injury" (Matter of Pantaleo v O'Neill, 192 AD3d 598, 599 [1st Dept 2021]). We found that the penalty was not shockingly disproportionate to the offense, noting that "[c]onduct far less serious than [Pantaleo's] has been found by the Court of Appeals to have a 'destructive impact . . . on the confidence which it is so important for the public to have in its police officers'" (id.).
NYPD also brought disciplinary charges against Sgt. Adonis, for failing to properly supervise Pantaleo. On August 21, 2019, Adonis pleaded guilty, forfeiting 20 vacation days as a penalty.[FN3]
Petitioners Seek a Section 1109 Inquiry
By notice and petition verified August 27, 2019, petitioners commenced this proceeding, pursuant to New York City Charter § 1109, in Supreme Court, New York County. Petitioners are eight New York City taxpayers, including Garner's mother, Gwen Carr, and sister, Elisha Flagg Garner, and Constance Malcolm, mother of Ramarley Graham, who was killed by NYPD officers in February 2012. Respondents are Mayor Bill de Blasio, [*5]NYPD Commissioner James P. O'Neill, FDNY Commissioner Daniel A. Nigro, and Kevin Richardson, the Deputy Commissioner in charge of the Department Advocate's Office, NYPD's discipline unit.
Petitioners acknowledge that prior proceedings have adequately addressed the issue of Pantaleo's misconduct subsequent to Garner's stop and arrest. However, they contend that numerous significant unresolved issues remained. Petitioners seek an order convening a summary inquiry into "violations and neglect of duties" by respondents in seven areas:
(1) the stop and arrest of Garner and the force used by officers on him;
(2) the failure, after Garner's death, to train NYPD officers adequately as to appropriate guidelines for the use of force and the prohibition on the use of chokeholds;
(3) filing false official NYPD documents concerning the arrest and making false statements in connection with NYPD's internal investigation of Garner's death;
(4) unlawfully leaking Garner's alleged arrest and medical histories;
(5) incomplete and inaccurate statements to the media by the City concerning Garner's arrest;
(6) the medical care provided to Garner; and
(7) the City's investigation and adjudication of, and imposition of discipline for the foregoing, including false statements by NYPD officers concerning the arrest.
On December 13, 2019, respondents moved to dismiss the proceeding. They contended, among other things, that petitioners' request was largely duplicative of various FOIL requests they had propounded and that any gaps could be covered by further FOIL requests, disposing of the need for the extraordinary remedy of a summary inquiry. Respondents further contended that a summary inquiry was unnecessary because they had publicly acknowledged the issues raised in the petition, and the incident itself had been widely publicized. Respondents argued that Section 1109 was unconstitutional as applied in this proceeding and violated the separation of powers doctrine by intruding the judiciary into municipal administration.
Petitioners opposed, arguing that this is an exceptionally important case involving the killing of an unarmed civilian by a government officer, in which numerous questions have been left unanswered despite five years of publicity and official scrutiny. Petitioners contended that it was doubtful that they would receive any responses to FOIL requests, given the lack of meaningful responses to FOIL requests they had already propounded. In any event, they argued that the existence of one means of transparency — FOIL — did not rule out the use of a second vehicle, by a Section 1109 inquiry. Petitioners pointed out that the courts have already repeatedly upheld the constitutionality of Section 1109, rejecting, among other things, challenges based on the separation of powers doctrine.
Supreme Court Grants a Section 1109 Inquiry
In a comprehensive 48-page decision, Supreme Court denied the motion to dismiss and granted the petition to the extent [*6]of ordering a summary inquiry into four of the areas noted above. Supreme Court observed that "the analysis of whether section 1109 [is] unconstitutional as applied to a particular summary inquiry [is] a sui generis inquiry, that is, each application must be analyzed on its particular facts" (Matter of Carr v de Blasio, 70 Misc 3d 418, 429). Supreme Court rejected respondents' argument that Section 1109 violated the separation of powers doctrine, explaining that "petitioners are not seeking declaratory and injunctive relief, nor are they asking the court to assume the management and operation of any City agencies. Rather, they are merely seeking a summary inquiry into specific questions of alleged violation and/or neglect of duty by City officials and employees" (id. at 430).
Supreme Court next rejected respondents' argument that it should "exercise its discretion and deny the petition as the events . . . have been sufficiently publicized" (id. at 432). Supreme Court found, rather, that
"the alleged violations and/or neglect of duty have not been acknowledged by respondents and there is no indication that any governmental agencies are investigating the actions of any police officers other than Officer Pantaleo"
. . .
"despite the publicity, much is still unknown about the actions of the police that resulted in Mr. Garner's death, including what, if any, investigations and disciplinary measures have been undertaken concerning the police actions, other than the administrative trial and firing of Officer Pantaleo, to ensure that the police officers and their superiors are held accountable. Public concern over the arrest and death of Mr. Garner continues unabated, and the words 'I can't breathe' continue to resonate"
. . .
"The allegations here, relating to the use of force resulting in the death of an unarmed man, are far from routine, and it is the view of this court that granting the petition is not likely to transform the courts into super-investigators of police misconduct."
(id. at 432-433).
Supreme Court proceeded to make specific findings as to each of the seven areas for which petitioners sought an inquiry. As to area (1), violations and neglect of duty in connection with the stop and arrest and force used by the officers, Supreme Court held that the facts as found in Pantaleo's administrative hearing "raise serious questions of whether there was a legal basis for the stop and arrest of Mr. Garner and whether the police use of force which resulted in his death, in an effort to arrest a man who police accused of selling an untaxed cigarette or cigarettes, was excessive" (id. at 435). While Supreme Court reiterated that Pantaleo's actions were addressed in the disciplinary hearing, it noted that the disciplinary proceeding "did not examine the question of whether there was probable cause for the arrest, or whether the force used by the police officers assisting Officer Pantaleo was reasonable or excessive, and, therefore, whether those officers [*7]violated both Mr. Garner's constitutional rights and the NYPD Patrol Guide" (id. at 437). Nor was there any evidence that the NYPD, the Mayor's office, or other agencies, including the Richmond County District Attorney or DOJ, ever investigated those areas, as distinct from Pantaleo's conduct.
As to area (3), false filings and false statements made in connection with the arrest and subsequent investigation, Supreme Court stated that it was unknown whether there had been any investigation into D'Amico's apparently false statements, in a form he filled out after Garner's death, that no force was used and that the top charge was a felony involving the sale of at least 10,000 untaxed cigarettes.
With respect to area (4), the leaking of Garner's arrest and medical histories, Supreme Court noted the existence of multiple New York Times articles appearing to cite police sources for reports that Garner had been arrested more than 30 times and citing his autopsy report in discussing his medical history. Supreme Court concluded that any leaks would violate laws sealing, among other things, police records ending in favor of the accused and autopsy reports in which there was an indication of criminality in the cause of death. Supreme Court found that it could reasonably be inferred that the disclosure of apparently confidential information in newspaper articles was the result of leaks. Supreme Court concluded that there was no indication that any investigation had been made into these apparent leaks, and therefore a summary inquiry was warranted.
As to area (6), concerning medical care provided to Garner by police officers, Supreme Court stated that the Patrol Guide requires officers to render reasonable aid to sick or injured persons. Supreme Court noted that, other than calling an ambulance and checking his pulse, the officers at the scene rendered no medical aid to Garner. Nor did the NYPD appear to have undertaken any investigation into the lack of aid provided by its officers at the scene. Supreme Court thus held that area (6) would be granted to the extent of inquiry into the officers' failure to render medical aid at the scene.[FN4]
Finally, Supreme Court held that area (5), which sought an inquiry into misleading statements made to the media about the incident that diminished the apparent seriousness of Garner's condition, would not be considered separately, but could be "explored as part of the summary inquiry granted in connection with" areas (1) and (6) (id. at 445).[FN5]
Discussion
/i>
The original predecessor of New York City Charter § 1109 is a statute enacted in 1873, in response to Boss Tweed-era corruption, to allow concerned citizens to get answers when city officials violated or neglected their duties and as a means of shedding light on wrongful diversion or misapplication of money (see L 1873, Ch 335, § 109). The statute assumed its current form in the New York City Charter revision of 1936 (as then Section 889), with the language simplified and the [*8]limitation to corruption-related matters removed. NY City Charter § 1109 states, in full:
"A summary inquiry into any alleged violation or neglect of duty in relation to the property, government or affairs of the city may be conducted under an order to be made by any justice of the supreme court in the first, second or eleventh judicial district on application of the mayor, the comptroller, the public advocate, any five council members, the commissioner of investigation or any five citizens who are taxpayers, supported by affidavit to the effect that one or more officers, employees or other persons therein named have knowledge or information concerning such alleged violation or neglect of duty. Such inquiry shall be conducted before and shall be controlled by the justice making the order or any other justice of the supreme court in the same district. Such justice may require any officer or employee or any other person to attend and be examined in relation to the subject of the inquiry. Any answers given by a witness in such inquiry shall not be used against such witness in any criminal proceeding, except that for all false answers on material points such witness shall be subject to prosecution for perjury. The examination shall be reduced to writing and shall be filed in the office of the clerk of such county within the first, second or eleventh judicial district as the justice may direct, and shall be a public record."
"Although inquiries into financial corruption may have been a primary reason for enacting the summary inquiry provision, the language of the current section 1109 could hardly be broader. It applies to all forms of official misconduct" (Matter of Green v Giuliani, 187 Misc 2d 138, 150 [Sup Ct, NY County 2000]), provided they involve "violation or neglect of duty" (Matter of James v Farina, 171 AD3d 44, 58 [1st Dept 2019]). "Violation" of duty means "an infraction or contravention of the law or a duty," while "neglect of duty" means "the outright omission of performance of a duty" (Farina, 171 AD3d at 62). The provision requires an allegation of "violation or neglect of duty;" mere allegations of "acts that amount to administrative inefficiency, deficiency, or mismanagement" will not suffice (id. at 58-59). Section 1109 "gives the Supreme Court justice discretion to determine when such an inquiry is called for or appropriate" (Matter of Riches v New York City Council, 75 AD3d 33, 39 [1st Dept 2010], appeal dismissed 15 NY3d 735 [2010]).
Section 1109 has been employed sparingly, with only two applications resulting in orders for summary inquiry granted since the original predecessor was enacted (see Giuliani,187 Misc 2d 138; Matter of Leich, 31 Misc 671 [Sup Ct, Kings County 1900]). Of these, only the Leich matter went forward with the summary inquiry; Giuliani was resolved before any proceedings were held (see Riches, 75 AD3d at 38 and n *). Accordingly, despite its seemingly broad scope, the summary inquiry mechanism is exceptional [*9]and not to be resorted to where other mechanisms for achieving its goal of transparency have been employed or are reasonably available (see Farina, 171 AD3d at 63). Nor is a summary inquiry appropriate for issues which lack some broader public significance supporting a need for transparency (see Riches, 75 AD3d at 39-40).
Generally, courts have considered three factors in assessing whether to hold a summary inquiry: (1) the importance of the issue that would be the subject of the inquiry (see generally Guiliani, 187 Misc 2d at 150); (2) the pendency of ongoing investigations or lack thereof (see Riches, 75 AD3d at 39); and (3) whether the violations and neglect of duties had been fully explored in public(see Farina, 171 AD3d at 63). We agree with Supreme Court and conclude that (1) the issues here are important because they involve the death of an unarmed civilian at the hands of public officials, notably police officers; (2) respondents do not dispute that there are no ongoing investigations into the matter; and (3) respondents have failed to make public any investigations or conclusions into the four relevant inquiries ordered by Supreme Court, aside from those related to Pantaleo. (a) Supreme Court Providently Exercised its Discretion
"Granting or denying [ ] an application [for a Section 1109 inquiry] is a matter of sound judicial discretion" (Matter of City of New York [Seligman], 179 Misc 505, 511 [Sup Ct, Bronx County 1942]; see e.g., Riches, 75 AD3d at 34). Section 1109 "should be liberally construed, and every available means to examine the administration of the city departments and the officers of its government should be utilized to the fullest necessary extent" (Seligman, 179 Misc at 511). We find that Supreme Court providently exercised its discretion in granting the petition for a summary inquiry.
Initially, respondents' argument that there is no need for a summary inquiry because Garner's death has been extensively investigated and reported on lacks merit, as it conflates publicity with transparency. While Garner's arrest and death have been the subject of profound national interest and scrutiny, only a narrow set of issues solely relating to the propriety of Pantaleo's conduct have been definitively and publicly addressed.
Notably, as to area (1), numerous officers assisted with the arrest or were otherwise at the scene, including D'Amico, who initiated the arrest and assisted with taking Garner to the ground. The officers' conduct implicates, among other things, constitutional and statutory provisions governing cause for arrest and use of force in effecting an arrest (see US Const Amend IV; NY Const, art I, § 12; Penal Law § 35.30; see also NYPD Patrol Guide Procedure No. 208-01[03]).
While IAB and other agencies investigated the incident, and five officers, including D'Amico and Pantaleo, were subjects of the IAB investigation, aside from Pantaleo, no findings as to the propriety of the officers' conduct have been issued [*10]publicly. Adonis pleaded guilty for her failure to supervise Pantaleo. However, there is no record of findings made in connection with that guilty plea. Nor have any findings been made transparent with respect to the reasons for the stop and arrest of Garner, including Bannon's belief that untaxed sales were being made in the vicinity that day and D'Amico's cause for arresting Garner. With respect to area (3), no investigation or subsequent findings have been publicized regarding the false filings and statements made in connection with the incident, including D'Amico's report that no force was used and that the "top charge" was a class E felony requiring an attempt to evade tax on 10,000 or more cigarettes, when only 95 cigarettes were found on Garner's person. If knowingly false or deceptive, D'Amico's filing may violate provisions of the Penal Law, the City Charter, and the Patrol Guide (see Penal Law § 175.30; NY City Charter § 1116[b]; NYPD Patrol Guide Procedure No. 203-08).
As to area (4), as previously noted, multiple newspaper articles were published containing nonpublic information apparently drawn from Garner's arrest history and autopsy report. Release of this information may have violated provisions governing the disclosure of criminal records (see 9 NYCRR 6150.4[b][6]; NYPD Patrol Guide Procedure No. 203-10[3]; see also Giuliani, 187 Misc 2d at 139-140). Respondents have not submitted any evidence of investigations into whether these media reports were the result of unlawful disclosures by City employees.
While respondents contend that the request for a summary inquiry into alleged leaks of Garner's arrest and medical histories is a mere fishing expedition as petitioners have not identified a potential conduit for this information, respondents themselves appear to identify at least one individual who had possession of the information: the president of the Patrolmen's Benevolent Association (PBA). Although the president of the PBA may not have been bound by confidentiality proscriptions, his alleged possession of such material may raise the question of who conveyed the material to him. Moreover, there is direct precedent for ordering a summary inquiry into leaks of confidential criminal records (see Giuliani, 187 Misc 2d at 139-140, 151-152).
As to area (6), the Patrol Guide requires officers to render medical aid to persons "requiring care due to arrest" (NYPD Patrol Guide Procedure No. 216-01). As we noted above, despite Garner's labored and then shallow breathing and unresponsiveness, the officers on the scene simply confirmed that he had a pulse, rolled him on to his side, and summoned an ambulance. The record is silent regarding any investigation into whether the officers on the scene violated their duty to give medical aid.
Respondents next contend that a more viable avenue for the transparency petitioners seek are FOIL requests. However, petitioners have demonstrated respondents' lack of response to their FOIL requests, particularly [*11]one they submitted in 2019 to both the NYPD and CCRB which sought records related to Garner's death and associated investigations. Petitioners allege that these records could have shed some light as to respondents' actions in response to Garner's death but have thus far failed to be produced.[FN6]
In any event, the fact that there may be an alternative means to gain the transparency petitioners seek does not preclude them from pursuing a summary inquiry. Section 1109 unambiguously contains no such restriction (see Matter of Brown v Wing, 93 NY2d 517, 522 [1999] ["the proper judicial function is to discern and apply the will of the legislature" when a statute is unambiguous] [internal quotation marks omitted]). Moreover, material sought in FOIL requests is subject to redactions and exemptions not applicable in a summary inquiry. Thus, we agree with Supreme Court that under FOIL, "the information available to petitioners would be substantially more limited than that which petitioners could seek in a summary inquiry" (Carr, 70 Misc 3d at 432).
In sum, Supreme Court providently exercised its discretion in granting the petition for a summary inquiry. (b) A Section 1109 Inquiry Does Not Violate the Doctrine of Separation of Powers
Respondents argue that a summary inquiry would also violate the separation of powers doctrine. Respondents maintain that in Farina, we held that Section 1109 only applies to cases that involve serious misconduct or a dereliction of duty. In our view this proceeding involves serious allegations of misconduct and/or dereliction of duty.
In Farina, we found that the question of whether a proposed Section 1109 summary inquiry violates the separation of powers doctrine is "a sui generis determination" (171 AD3d at 52). In this regard, "each section 1109 application must be viewed on its own merits based on all relevant factors, and mandates an inquiry devoted to the particular facts and circumstances" (id.). Thus, "a summary inquiry into areas that do not touch upon policy determinations . . ., but merely deal[s] with administrative matters, will not violate the separation of powers doctrine," as it does not seek to "obtain general oversight . . . concerning these issues" and merely attempts to create a "public record of [the] means and methods employed" (id. at 52-53). In essence, this construction of the separation of powers doctrine as it relates to Section 1109 is a constitutional corollary to the general understanding that Section 1109 inquiries must be limited to actual violation or neglect of duty, rather than allegations of "acts that amount to administrative inefficiency, deficiency, or mismanagement" which will not suffice (Farina, 171 AD3d at 59).
The summary inquiry ordered by Supreme Court here is limited to allegations of actual violations or neglect of duty and attempts to make transparent the investigations conducted and conclusions reached by the relevant governmental agencies. While it is possible that policy shortcomings [*12]may be revealed through testimony adduced in the inquiry, that is simply a function of exploration of the allegations of violations and/or neglect of duty. Importantly, petitioners do not seek equitable relief. Nor is Supreme Court being asked to assume the management or operation of City agencies. Accordingly, the summary inquiry ordered here does not violate the constitutional doctrine of separation of powers.
Respondents' arguments, when taken to their logical conclusion, will render Section 1109 obsolete, as, under their interpretation, any Section 1109 inquiry requiring transparency about investigations and conclusions would violate the separation of powers doctrine. We note that respondents have made no showing that they conducted any investigation into the four areas of inquiry ordered by Supreme Court. Instead, they have offered conclusory pronouncements that they have conducted investigations and that petitioners are simply unsatisfied by their results. We disagree. It is undisputed that there are no public factual findings that shed light on the incident, except for the ones related to Pantaleo. Therefore, Supreme Court correctly held that a summary inquiry was warranted, as failure to investigate these enumerated areas was a "neglect of duty" amounting to "an outright omission of performance of a duty" or "serious improper conduct" (see Farina, 171 AD3d at 61-62).
We emphasize that the areas of inquiry as ordered by Supreme Court do not and may not seek to second-guess the wisdom of policy decisions made by respondents. Rather, the Section 1109 inquiry seeks transparency into what respondents decided and on what basis. A public review of respondents' alleged investigations and conclusions is precisely the transparency contemplated by Section 1109.
Accordingly, the Section 1109 inquiry ordered by Supreme Court does not violate the separation of powers doctrine. (c) This is the Rare Instance that Warrants a Section 1109 Inquiry
Respondents argue that it would be inappropriate to hold a summary inquiry into the conduct of low-level police officers, as this is not the purpose of Section 1109 and would open the floodgates to similar inquiries. This argument too is unavailing.
As we noted above, the text of Section 1109 unambiguously provides that it applies to "any alleged violation or neglect of duty in relation to the property, government or affairs of the city." This necessarily includes any violation or neglect of duty by low-level police officers that respondents contend would be implicated in the inquiry.
In any event, while it is correct that the allegations may principally involve low-level officers, some of them may concern the supervisory, oversight and investigatory duties of senior officials. Moreover, the allegations of violation or neglect of duty by front-line officers should be considered in the light of the totality of the circumstances. Garner's death may have set the stage for a debate about the role of race in policing[*13]. His repeated last words — "I can't breathe" — have become a rallying cry against excessive force by police. Viewed in this context, the issues raised in the arrest and death of Garner and its aftermath are of the greatest significance.
We are mindful that a tightrope of sorts must be walked here. The separation of powers doctrine forbids a summary inquiry from being invoked solely as a tool for exposing poor policy. However, the testimony adduced at the inquiry may raise important public policy issues. In a sense, the analogy is to the fundamental proscription against advisory opinions and the rule that courts may give opinions only on justiciable controversies (see Cuomo v Long Is. Light. Co., 71 NY2d 349, 354 [1988]; American Ins. Assn. v Chu, 64 NY2d 379, 383 [1985], cert denied 474 US 803 [1985]). Similarly, courts considering Section 1109 petitions may not order inquiries into matters of pure policy; the petition must be rooted in allegations of violation or neglect of duty. This requirement is met here.
Nor do we agree that a flood of summary inquiry petitions will be unleashed by affirmance of the order here. The separation of powers limitation, the requirement that the allegations relate to a matter of some significance, and the restriction of the summary inquiry mechanism to matters in which no investigations have been had or publicized or are likely to be available, combine to cause the Section 1109 inquiry to be an exceptional remedy of last resort. This is borne out by the simple fact that, in nearly 150 years, only approximately 20 summary inquiry petitions have been brought, and, of those, only two were granted. This case is that rare case in which allegations of significant violations of duty and a clear lack of substantial investigation and public explanation conjoin to warrant a summary inquiry.
Finally, in view of the foregoing, we dismiss as academic respondents' appeal from the December 2020 order holding that the CPLR 5519(a)(1) automatic stay does not apply.
Accordingly, the order of the Supreme Court, New York County (Joan A. Madden, J.), entered September 24, 2020, which denied respondents' motion to dismiss the petition brought pursuant to New York City Charter § 1109, and granted the petition to the extent of ordering a summary inquiry into (1) alleged violations and neglect of duty in connection with the stop and arrest of Eric Garner in the fatal incident on July 17, 2014, and the force used by police officers other than Officer Daniel Pantaleo; (2) the filing of official documents concerning Garner's arrest; (3) the leaking of Garner's alleged arrest history and medical conditions in the autopsy report; and (4) the alleged lack of medical care provided to Garner by police officers, should be affirmed, without costs. The appeal from the order, same court and Justice, entered on or about December 23, 2020, which granted petitioners' motion for an order directing the parties to move forward with judicial inquiry [*14]proceedings during the pendency of respondents' appeal from the September 24, 2020 order, should be dismissed, without costs, as academic.
Order, Supreme Court, New York County (Joan A. Madden, J.), entered September 24, 2020, affirmed, without costs. Order, same court and Justice, entered on or about December 23, 2020, dismissed, without costs, as academic.
Opinion by Singh, J. All concur.
Renwick, J.P., Kern, Singh, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: July 15, 2021



Footnotes

Footnote 1: Some of the facts below are taken directly from the lower court order Matter of Carr v de Blasio
(70 Misc 3d [Sup Ct, NY County 2020]).

Footnote 2: We note that although D'Amico initially stated that he observed Garner conducting two sales of untaxed cigarettes, at Pantaleo's administrative trial D'Amico testified to witnessing only one such sale.

Footnote 3: Separately, FDNY's Office of Medical Affairs (OMA) reviewed footage of the incident and banned the two EMTs and paramedics who responded t0 the incident from providing patient care within the 911 system. When OMA learned that the paramedics were not involved in patient care at the scene, it lifted the ban as to them. However, the two EMTs remained banned pending RUMC's medical case review of their actions. In 2016, RUMC submitted a summary of their medical case review to OMA, together with a request that they be cleared to resume 911 patient care. OMA granted the request.

Footnote 4: Supreme Court also noted that EMS workers, although present at the scene, rendered no aid there. However, in light of OMA's action with respect to the four EMS workers who responded, as well as the medical case review undertaken by RUMC, there was no "complete failure" on the part of FDNY to investigate (id. at 446). Accordingly, Supreme Court declined to order any inquiry into the actions of the EMTs and paramedics. This branch of the ruling is not on appeal.

Footnote 5: As to areas (2) and (7), relating to the alleged failure to train NYPD officers in the use of force after Garner's death and concerning the City's investigation, Supreme Court found them to be either speculative or duplicative and thus do not warrant independent scrutiny. This branch of the ruling is not on appeal.

Footnote 6: Respondents agree that by July 2020, the agencies had yet to produce much of a response to their 2019 FOIL request, and the agencies' own proposed deadline in March 2020 had already passed. At argument before Supreme Court, respondents' counsel acknowledged that the documents had not been produced due to the pandemic, but believed they were being actively reviewed and pursued. Petitioners' counsel acknowledged this but noted that although petitioners have since received some response to their request, all documents have been heavily redacted.